Just give me a second. May it please the Court, Counsel. Greg Erickson on behalf of Appellants Robert and Jennifer Audette. This case has an extremely simple fact pattern. Mr. Audette erroneously installed a 12-foot walkway from his cabin in Lake of the Woods County to the lake. In doing so, he believed at that time that he was acting lawfully and in compliance with DNR regulations. Where is his primary home? I don't see in the record where his primary home is at the time. I apologize. This is his primary home. My in-laws have both a home and a cabin. I thought he was beefing it up for a retirement home. I'm asking where was he coming from? This was his home. This residence was his home. Both Audettes lived there? Correct. Around the clock. He was preparing it because Ms. Audette suffers from multiple sclerosis for a degeneration in her condition such that this walkway would become eminently necessary. At the time, she is currently suffering from MS. She gets dizzy. She has difficulty with balance. So the walkway enables her to walk from her home into the lake. I get that she needed a walkway. That's completely understandable. But why does she need a 12-foot boat ramp? That's what I'm trying to figure out. Four feet is sort of the normal, I think, size of a sidewalk. So why do you need something three times as big as that? Your Honor, that's not the analysis. Just answer the question. Then we'll decide whether that's the analysis. In the record, Mr. Audette built the 12-foot walkway just in case he needed a vehicle to take Ms. Audette from the home, like a four-wheeler or a van. That was the purpose for the 12-foot walkway, ostensibly. But the important thing for the court to understand is that in terms of the ADA, the term necessary only means does the person suffer from a disability and is the accommodation, i.e., the walkway, necessary, meaning essential to enjoy life activities. So you could build a ramp the size of a football field if you wanted to. I mean, the government can't do anything about it. No, I'm not saying that the government can't do anything about it. If the government, in this case, engaged in an ADA reasonable accommodation analysis with the Audettes and said, listen, your 12-foot walkway is too large for our liking. And one of the things I need the panel to understand is Mr. Audette was not using this to bootstrap his ability to have a 12-foot boat ramp, okay? I thought he had this expanded garage and he had a special pathway from the deck. Your Honor, this is a critical fact. I mean, the map shows this part is okay and this part. This is a critical fact for everyone to understand. The Audette's lot is too shallow to launch a motorboat from. The only thing that could be, quote-unquote, launched from this would be a kayak or a rowboat. You cannot have a boat with a motor and that's part of the record. But my understanding, you know, on the 12-foot, my understanding is, I don't know whose responsibility it is, but I do not, I understand the record to be saying at least towards the end, the Audettes were firm on 12 feet. We need 12 feet. We're not going to take 4 feet. 12 feet is the ramp we need. Am I misreading the record? That is completely false, Your Honor. That is completely and utterly a misunderstanding of the record. What the record says is that even though... There's a difference between false and misunderstanding or misinterpreting the record. That's the kind of exaggeration your brief, frankly, is full of. Your Honor, the point that I'm trying to make is for the panel, the Audettes had a right under the statute for a 4-foot walkway. At a minimum, what the panel should have done is they should have, if they had paid any respect to the ADA at all, they would have said, listen, a reasonable accommodation here is we need to limit your 12-foot walkway to a 4-foot walkway. But what they did in this case is they said, rip it out in its entirety and engaged in no analysis under the ADA at all. The problem with what they did is that this is the first time in, as far as I can tell, the nation's history in which a district court has failed, has applied the too little, too late analysis to a Title II case. Every case cited by the respondent is an employment case. Every case, we've cited zillions of cases, including a case authored by Your Honor, One Love Housing v. The City of Anoka. This court engaged in an ADA analysis in that case, and so did this court in Oxford House, and so did the Seventh Circuit in Sombayanas. And the reason for that is because when you have an after-the-fact conditional use permit process, if they decide, if the county decides to participate in that process, which they did here and charged us a five times the normal fee in order to participate in that process, once you participate in that process and you allow their after-the-fact conditional use permit application to be considered, then the ADA applies. And every circuit in the United States has applied it to after-the-fact conditional use permits, except for the district court. You know, I'm not fond of the too little, too late standard in this context, but I can see where it at least comes from, sort of, from the statute, which is it requires the interactive process that you mentioned. And I think the argument would be you can't really engage in the interactive process if the homeowner builds something and then says, okay, let me have it. Like, you know, that's not interactive. And so I think that's the reason, whether it applies here or not, I think that's the reason why courts apply it. Oh, in an employment context, I do agree. In an employment context, once, let's say, for example, a crazy, let's just say that I work for you. And in front of all of our coworkers, at the company party, I start shouting obscenities at you, okay? If I have an ADA explanation for my behavior, i.e., Tourette's, okay, that's something that I need to tell you about before I shout obscenities to you at the party, because that's a genie that can't be put back in the bottle. Because all of our employees saw me swear at you and saw my behavior, and it has an effect on the workplace, on everybody's respect for me, and it's a genie that can't be put back in the bottle. This is not going anywhere. Your Honor. I mean, that long dissertation doesn't have anything to do with this. Well, I think it does. The issue is brief, but frankly, you're not going to, it's somehow a misapplication of the law. Your Honor, that was the entire basis of the district court's decision. It was the description of, you know. Yeah, it's just wrong. Well, we're going to have to agree to disagree. Yeah, well, we sure do. Because what this decision entailed, by the complete rejection of the ADA, was a... There's no complete rejection of the ADA in this opinion? No, I'm not saying that the judge rejected the ADA. You just did say that. I'm saying the Board of Commissioners rejected any ADA analysis. It's in our briefs, and it was acknowledged by the district court. Not in those exchanges that, well, there was one meeting your clients didn't come to, which was a critical one, and there was another one where there was a back and forth. We were not noticed of that meeting, your Honor. That's a disputed fact. The people on the committee themselves... Has the restoration order been complied with insofar as RIPRAP is concerned? Has the walkway been torn out? No, forget the walkway. My knowledge of these issues out at Lake Minnetonka, the RIPRAP is the most important thing to the conservation people. I don't think that anything has been done with the RIPRAP. Yeah, well, that was the order. The RIPRAP that's been added has to come out of there. Your clients were given, as I recall, seven months to do that, and two weeks before the end of the seven months, they started the dispute. I didn't see any indication, and I'll bet there's not been one piece, one RIPRAP boulder removed. Well, as we sit here today, this case is... Is that in the record? I do not think that the condition of the RIPRAP currently is in the record. I can tell you that they are currently facing a criminal charge for failing to remove the walkway while this appeal is pending. How about the RIPRAP? I don't know what's happened with the RIPRAP, but I do want to point out to this Court that this 12-foot walkway exists all over this lake, and including at the home, and this is in the record, of one of the commissioners. So if this 12-foot walkway is such a deviation from the standards of the community, such that you don't have to comply with the ADA... That's not the most important deviation, I don't think, in their explanation of the problem here. That was something that was done and shouldn't have been done, but the RIPRAP was the more serious damage to the lakefront, to the shoreline. Well, every walkway is going to interfere with the RIPRAP in some manner or fashion. Counsel, what is there in the record to indicate there is an animus for the disability at issue here? There are numerous references to, one, calling their request for an after-the-fact conditional use permit, likening it to an amusement park, likening it to insider trading, and likening it to applying for a fake ID. The record is replete with evidence, evidencing animus towards people with disabilities. Wait, hang on, I don't follow that. So I understand the animus towards the odd debts. That's like, oh, we would be allowing people to build anything, but I don't understand it being animus towards a disability. Can you explain that? Well, Your Honor, this is a woman with MS that's asking for permission for a walkway. And when you liken that to insider trading, how is she not supposed to feel like she's being attacked for her attempt to ask for an accommodation for a disability? Also in the record is sworn testimony that somebody from the county said to Mr. Odette, do you think you're special because your wife has MS? That is direct evidence of discriminatory animus, and obviously something that we think is completely inappropriate and kind of, for lack of a better description, kind of tainted this process. I'm going to reserve the last 30 seconds for rebuttal. Mr. Wolf. May it please the court. My name is Andrew Wolf, and I'm here on behalf of the appellees, Lake of the Woods County, among others, the county board in their official capacity as well as the county board as a whole. We ask that the court affirm the district court's grant of summary judgment to the county and reaffirm that the Americans with Disabilities Act is about equal opportunity. And here that means recognizing equal opportunity may involve access, but it doesn't involve amnesty for constructing a 12-foot-wide concrete ramp over riprap in a protected shoreline right up to the shore of Lake of the Woods. Why not, you know, and maybe there's something in the record which is really what I'm looking for, why not just allow them to, you know, may require some construction, but take the 12-foot and make it 4 feet, which would be the normal size of a sidewalk? Yes, Your Honor, and that has been offered to them many times, and it's still on the table. As far as I know, regarding Judge Loken's question about what is the state of the ramp right now, I believe I asked Mr. Audette to look at a picture and say, is this what the property looks like? As far as I know, it has not changed since the day that concrete was poured. And if the Court's looking... 4 feet is allowed not as a matter of right, because you still have to apply for the permit, but it's expressly spelled out in the ordinance for people with mobility issues. They may have a 4-foot walkway to access the lake. You say that's been offered and that's in the record. It's in the ordinance, so, I mean, even if it wasn't offered, it was essentially offered, because if they read the ordinance prior to the construction, they would have seen we have... Yeah, but I don't know if that's fair, because the argument is it's too little, too late. And so they could reasonably believe that the city would come back and say, or the Board would come back and say, nope, too little, too late, you could have built a 4-footer, but you had to get the permit ahead of time, and you had to ask us for it. Why isn't that a reasonable sort of response to the argument you're making? Well, here's why. Appendix 255, Ms. Saadat says the reason for the ramp being 12 feet wide is in case in the future, God forbid, I'm in a wheelchair, which she's not currently. I asked her, are you aware that Josh Stromlin, the Community Development Director, in 2022, mentioned you could have a 4-foot wide path down to the lake? Yes, or correct. You're aware of that. Yes. And that was not acceptable to you because you needed the 12 feet. Correct. For the future, right? Correct. Yes. They have had that option. The county has not said too little, too late. This is a county employee who's continuously saying, change your proposal, make it 4 feet, and then we can talk about that, because 4 feet is important. It recognizes, yes, some people may need assistance getting down to the lake, but we also have a fragile ecosystem here, and it's sort of the tragedy of the commons. If everyone has a 12-foot wide ramp, then we're going to degrade the lake. We're going to eliminate riprap that was put in place to avoid erosion. What's your response to the other side that says that these 12-foot ramps are around the lake? I think that is not entirely accurate. What I would say, though, is there is no other ramp around the lake that was not properly permitted and did not go through the process where the county could say, here's what we're going to require you to do in order to put a 12-foot wide ramp in. That could be anything from enhancing the native vegetation, keeping additional areas. So all of those that are there were permitted. There's no other unpermitted ramp other than the Odets on Lake of the Woods. And they were permitted after the fact or before? I don't have that information, but this would be the only unpermitted ramp on the lake. And to get to Judge Loken's point about, and Judge Strass, you used the term too little, too late, and so did the district court. But the fact of the matter is, this is a recurring issue in these Title II cases. Oxford House said that a plaintiff must first provide the governmental entity an opportunity to accommodate through the established procedures. One law reaffirmed that and said the failure to use those procedures is fatal to a failure to accommodate claim. What about the fact that the conditional use permits are permitted after the fact? I mean, you can do that after the fact, and there have been, I assume, some that have been passed. Does that make this different than, say, an employment claim as opposing counsel points out? I think it makes it different only to the extent that if there is an action taken to fire someone and then they say, hey, wait a minute, I need accommodation. Then, yes, you can see why there's a too little, too late there. If the accommodation here was something that is not a structure connected to the ground and intended to be permanent, then maybe there would be some leeway to say, you know, that shouldn't apply here. And, in fact, we're not asking the court to say too little, too late is the rule. It applies across the board. And we don't think the district court said that either. We think the district court said, under these facts, this applies. Well, and that just, you know, I'm kind of following up on Judge Smith's point because the fact of the matter is if you have other properties that have a 12-foot ramp, and I heard you mention, well, they put in vegetation and they did all of these other things. What is absent from this record is any indication the board came in and said, you need to do those things, the audats. You've got to do these same things that we've required elsewhere. It's just, no, you've got to tear out the 12-foot ramp and maybe put in a 4-foot ramp or whatever the alternative or no ramp at all. And I'm just wondering if that gives rise to a potential ADA claim. It doesn't because the burden was on the audats to, you know, prove that this was a reasonable and necessary accommodation. And Ms. Audet said that this was not necessary. She's not in a wheelchair. Any of us could in the future be in a wheelchair. She might have a higher probability of it, but she's not currently. And so there's no accommodation for someday I might need that. And so there was no one at the meeting when the county board discussed this to explain, this is why this is a reasonable accommodation, this is why it's a necessary accommodation. And the reason why they weren't there, I mean, we do know that in one of the transcripts, Ms. Audet is told by the board, this is when the county board is going to hear it. So that's not really a disputed fact. But they couldn't show that this was a reasonable and necessary accommodation because she admitted, I don't need this right now. This is for the future. This is, for words, God forbid in the future I am in a wheelchair. And I take it, and I shouldn't assume anything, that if they had complied with the four-foot limitation, and in fact her MS did severely worsen, and she still had, should, arguably a right to access the lake, there would be a procedure for widening the four feet, right? Yes, and Mr. Stromlin... It probably isn't even after the fact permit. Now they've got a permit and they want to modify it. Yeah, it would be an amendment to their existing conditional use permit. And Mr. Stromlin mentioned that this four-foot wide, that's the rule for everyone. And if we look at the last paragraph of that portion of the ordinance, it talks about incorporating the Minnesota Building Code for accessibility paths. And his interpretation, as he says in his declaration, which is in the record, is that that allows as much space as you need. If you needed to have a wheelchair van, you could have that. We would have to then go through the process and figure out what can we do to ensure that our goal of maintaining this shared ecosystem is maintained and preserved. That's not what happened here, though. We had someone just put a ramp down without asking permission, after getting permission, to pour his large driveway. And so it's not needed for potential future need only. It's not reasonable also. Also in one law, Judge Loken, you said that an exception to a rule not necessitated by a disability is presumptively unreasonable. Here Ms. Audet says this is not needed. Currently, it's just for the future. This is presumptively unreasonable. Lastly, I just want to address the disparate treatment argument. The fact of the matter is there is no evidence that there was any discriminatory animus. The district court looked at each one of the statements that counsel addressed here today, looked at them in context. And the context is amusement park, when that was said, it was, well, if we're going to allow someone to build something and then just get approval after the fact, someone could build an amusement park. They're not saying people with disabilities belong at the amusement park. It's nothing like that. Insider trading, that was, well, they knew the rules and they did it anyway. The underage drinking thing, that was, if a German foreign exchange student comes and gets caught underage drinking, he's used to the rules being 18 to drink. Here, he should be treated differently because he didn't know the rules. Here, the Audets knew the rules. All of these examples do not show any sort of discriminatory animus towards people with disabilities. It shows a frustration with the fact that the Audets didn't follow the process in place. Returning to Josh's question about the after-the-fact process, I would just note that the ordinance doesn't specifically provide an after-the-fact process. It is one of the options the county has in enforcing violations, talking about abating a violation. Sometimes it's better to say, okay, well, you have to come in and apply after the fact, get approval, and then this violation will no longer be a violation. It's not, well, you can do this. This is part of the standard procedure. Go ahead and build whatever you want, and then you can just come in after the fact. That's not how that works. Unless there's any other questions, I would just ask the court to affirm the district court's judgment that appellants failed to give the county. When was this? Was it like 2009? When did they put in the non-complying? I believe it was 2021. Okay, so we've got five years, and I assume it hasn't been remedied. And if we affirm, what enforcement proceedings are pending or possible? Well, so the DNR has its own criminal complaint that it was already pursuing when this lawsuit was filed, and the county attorney agreed to stay that pending this litigation. From the county's perspective, like I said, they could send a request tomorrow saying, we're going to cut it down to four feet, and I can't speak as to what the county would say, but my sense from the record is they would be very receptive to that offer. And if there's no other questions, I would just ask again that that. You could seek civil penalties or daily penalties for the amount of time that the riprap has been disturbed? And the state is also the one that is responsible for that riprap that was put in. I believe because of how long this has gone on, I believe the time period for that, I believe, first of all, that the DNR actually modified that administrative rule regarding the riprap. Well, what's the prosecution for? You're not answering me. The prosecution is for violating the Wetland Conservation Act because they also, in addition to going through protected shoreland, they went over wetlands without getting approval for a Wetland Replacement Plan. And that, again, just like the county's ordinance, the Wetland Replacement Plan is supposed to go through that process to first avoid it. So the county would be remedying the initial violation and the failure to remedy it? The zoning violation. The state would be responsible for the Conservation Act violations. And so what are the zoning violation remedies at issue? It's not criminal, but it's civil, isn't it? Civil monetary penalties. Sure. So in that same ordinance that says that the county can bring an enforcement action, it says that there could be a criminal misdemeanor charge. They haven't been charged with a misdemeanor by the county yet. And I don't anticipate that they would be. It also says that the county can require them to ask for an after-the-fact permit. These are all enforcement actions that the county could take. As it stands today, though, the order to remove the ramp is still in place. And I do want to highlight that again. What are the civil? What is the meter that's running monetarily? There is no meter that's running monetarily. I thought there were daily civil penalties. There could have been, but the county has not applied any daily penalty to them. But they could once the lawsuit is over? They could. They could count every day the violation as in place as a violation of the ordinance. Right. Correct. But that has not happened. I know it hasn't happened, but I ask what could happen if we affirm? And I can't speak to what will happen. Well, the audits, if they haven't thought about this, probably should. I agree, Your Honor. Yes. I'm just trying to get on the table what they're risking by not just getting. I mean, they could get it done and still have this lawsuit continue. Yes. They have chosen not to do that. And my suspicion was, and I'm trying to. Nobody will confirm it because they won't answer questions. Is that the meter is running? There's no meter running currently. Unless the statute of limitations has run, there's a meter running. Well, every day the violation is in place as a violation of the ordinance. So if the county decides we're going to say this is a misdemeanor violation or we're going to say that there's a. The first violation in 2021, what's the statute of limitations for enforcing that daily penalty? I'd have to. I don't know. Okay. I'm out of time, so I'll just. It's too much fun to litigate these hypothetical questions, which is what clients don't deserve. That's correct, Your Honor. I would just ask again that the court affirm because, one, appellants failed to give the county a chance to accommodate. Two, they failed to carry their burden to show that the requested accommodation was reasonable and necessary. And third, there's no evidence of a disparate treatment. Thank you. Thank you. I'll give you a minute for rebuttal. Thank you, Your Honor. I'd like to go back to the council's representation that an accommodation was offered to the audets. That is completely contrary to the record. And I'll cite you. You mean because it wasn't stated and the word accommodation wasn't used? No. There was no offer of a four-foot walkway, period. There was no offer of a four-foot walkway. But I thought it was in the initial discussions. It was. At least. It was not in. First of all, the audets were not there. Okay. Then the discussion of the four-foot walkway was not an offer made in their decision. And if you look at page 29 of the district court's argument, this is confirmed. Because I was reading from a deposition transcript of one of the commissioners, Mr. Arneson. Okay, Mr. Arneson, this is the board's decision right here. Yes, I recall that. Okay, what's that, November 9th? Yeah. Where's the accommodation? I don't see one in the decision. So there was none, correct? I guess that's correct. If these three sentences are the decision, and the decision is dated November 9th, which I recall, I don't recall at any time making an accommodation. So that's sworn testimony in the record. It's confirmed by the November 9th order, which all that it says is, you're in violation, rip it out. And back to the concept where the disabled party is supposed to know what the ordinances are, that's a misstatement of ADA law. And I'll reference the court to Taylor v. Phoenixville School District, and that's in the Third Circuit, 184. And these are all in your brief? That's correct. Okay. And the employee applicant not apprised the employer of specifics. Your time is up. Thank you.